UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ERICKSON JHONAIKERHT HERNANDEZ
VILLASMIL,

                                        Petitioner,

        vs.                                                  9:26-CV-713
                                                            (MAD)
TODD BLANCHE, JAMES BAUSCH, PHILIP
RHONEY, TODD LYONS, and MARKWAYNE
MULLIN,

                                        Respondents.

_____

APPEARANCES:                            OF COUNSEL:

BOROWSKI WITMER                         MATTHEW BOROWSKI, ESQ.
IMMIGRATION LAWYERS
4343 Union Rd
Buffalo, New York 14225
Attorney for Petitioner

OFFICE OF THE UNITED                    KAREN F. LESPERANCE, AUSA
STATES ATTORNEY
James T. Foley U.S. Courthouse
445 Broadway, Room 218
Albany, New York 12207
Attorney for Respondents

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.  INTRODUCTION

On April 13, 2026, Petitioner Erickson Jhonaikerht Hernandez Villasmil filed a petition

for habeas corpus seeking relief from his detention by the Department of Homeland Security's

("DHS") Immigration and Customs Enforcement Office ("ICE").  *See* Dkt. No. 1.  Petitioner

names the following individuals as Respondents: Acting U.S. Attorney General Todd Blanche,

1

Deputy Field Office Director of the ICE Buffalo Field Office James Bausch, Deputy Field Officer Director of the Buffalo Field Officer Philip Rhoney, ICE Acting Director Todd Lyons, and Secretary of Homeland Security Markwayne Mullin (collectively, "Respondents" or "the Government"). *See id.*

Petitioner was detained by ICE on the same day that he filed his petition: April 13, 2026. He requests immediate release or an order requiring Respondents to hold a hearing pursuant to 8 U.S.C. § 1226(a) with the Government bearing the burden of proof as to why Petition must remain detained pending his immigration proceedings. *See id.* at 18. Respondents oppose the Petition. *See* Dkt. No. 3. Petitioner filed a reply. *See* Dkt. No. 4.

For the following reasons, the Petition is granted.

## II. BACKGROUND

The facts set forth in the petition are straight forward: Petitioner, a citizen of Venezuela, "entered the United States lawfully on September 2, 2023[,] at or near Brownsville, Texas pursuant to the 'CBP One' program and was released into the United States on humanitarian parole." Dkt. No. 1 at ¶¶ 1-2. He was released on parole as neither a flight risk nor danger to the community. *See id.* at ¶ 3. Petitioner filed an application for asylum and was issued a work permit. *See id.* at ¶ 5. He was detained by ICE on April 13, 2026, in Troy, New York. Petitioner asserts that his detention falls under 8 U.S.C. § 1226(a) of the Immigration and Nationality Act ("INA"). *See id.* at ¶ 28. Petitioner argues that "the mandatory detention provision of § 1225(b)(2) does not apply to people like Petitioner, who has already entered and was residing in the United States at the time he was apprehended." *Id.* at ¶ 41.

Respondents provided more background information in their response and disagree about the applicable statutory authority. Respondents explain that the CBP One mobile application was

2

launched in October of 2020. *See* Dkt. No. 3 at 10. It was made available to individuals seeking to enter this country through a port of entry under a specific Public Health Order. *See id.* The Public Health Order was eventually terminated, but CBP One was maintained "as a 'mechanism for noncitizens to schedule a time to arrive at [ports of entry] along the [Southwest Border], to allow an increasing number of migrants who may wish to claim asylum to request an available time and location to present and be inspected and processed at certain'" ports of entry. *Id.* (citation omitted).

Respondents state that two executive orders were then signed by the President on January 20, 2025. *See id.* at 11. Respondents explained that the first executive order directed

> the Secretary of State, the Attorney General, and the Secretary of Homeland Security to take actions including "ensuring that the parole authority under section 212(d)(5) of the INA (8 U.S.C. § 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole," and "ensuring that employment authorization is provided in a manner consistent with section 274A of the INA (8 U.S.C. § 1324a), and that employment authorization is not provided to any unauthorized alien in the United States."

*Id.* (quoting Executive Order 14159 § 16(a) & (c); 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025)). The second executive order "directed the Secretary of Homeland Security to '[c]ease using the "CBP One" application as a method of paroling or facilitating the entry of otherwise inadmissible aliens into the United States,' and to '[t]erminate all categorical parole programs that are contrary to the policies of the United States.'" *Id.* (quoting Executive Order 14165 § 7(a) & (b), 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025)). According to Respondents, "[t]he [executive orders]

themselves did not terminate parole or take any other action concerning parole, but rather exhorted DHS to examine and modify its processes as appropriate to fit these principles." *Id.*

The same day that the executive orders were issued, "Acting Secretary of Homeland Security Benjamine Huffman issued a directive to end 'the broad abuse of humanitarian parole and return[] the program to a case-by-case basis.'" *Id.* at 11 (quoting Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole, Jan. 21, 2025, https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-law-enforcement-and-ending-abuse). Three days later, on January 23, 2025, Acting Security Huffman issued a memorandum authorizing the DHS to alter any parole program that was inconsistent with his previous directive. *See id.* at 12. The CBP One application was discontinued in January of 2025.

Approximately two and a half months later, in April of 2025, DHS sent parole termination notices to individuals who had been paroled into the United States after using the CBP One application. *See id.* at 13. DHS terminated Petitioner's parole on April 18, 2025. *See* Dkt. No. 3-1 at ¶ 6. In a document provided by Respondents, U.S. Customs and Border Protection indicated "DHS has exercised its discretion and terminated this parole on 4/18/2025." Dkt. No. 3-2 at 13.

One year later, on April 12, 2026, immigration officials issued a warrant for petitioner's arrest through a Form I-200. *See* Dkt. No. 3-1 at ¶ 7. Respondents state that ICE Officers observed Petitioner leave his "last known residence." Dkt. No. 3 at 8. The Deportation Officer who completed the Record of Deportable/Inadmissible Alien on April 13, 2026, stated that Petitioner's "current address [is] in Newark NJ and [he] failed to update his new address in Troy . . . ." Dkt. No. 3-2 at 10. Neither party explains why or how ICE officers located Petitioner in Troy, New York a year after his parole was terminated.

Nevertheless, on April 12, 2026, ICE officers "conducted surveillance and observed" Petitioner leave an address with laundry and walk to the laundry mat. *See* Dkt. No. 3-2 at 10. The officers positively identified Petitioner. *See id.* The next day, ICE officers "conducted a targeted enforcement operation" and observed Petitioner leaving his house and getting into his vehicle. *Id.* The officers stopped Petitioner's vehicle and requested his identification. *See* Dkt. No. 3-1 at ¶ 8. Petitioner identified himself as "Erickson" and informed the officers "that he had entered the United States illegally, and . . . was currently in immigration proceedings." *Id.*

Petitioner was 19 years old when he was paroled into the United States on September 13, 2023. *See* Dkt. No. 3-2 at 1. Petitioner has no criminal history. *See* Dkt. No. 1 at ¶ 4; Dkt. No. 3-2 at 2, 9, 11. He is employed by Wendy's fast food. *See* Dkt. No. 3-2 at 12. Petitioner has an immigration court hearing scheduled for June 2, 2027, in Newark, New Jersey. *See id.* at 11.

### III. DISCUSSION

The Government argues Petitioner's detention is not violative of the INA and does not raise constitutional due process concerns because detention was mandatory when his parole was terminated and he had been detained for only a few hours when he filed the petition. *See* Dkt. No. 3 at 7-8. The Government relies on 8 U.S.C. § 1182(d)(5)(A), which states as follows:

> The Secretary of Homeland Security may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien *and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled* and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C.A. § 1182(d)(5)(A) (emphasis added); *see* Dkt. No. 3 at 13-14.  Respondents argue that "since Petitioner was granted parole upon his arrival in the United States, his status when his parole ended reverted to that of an arriving alien seeking admission."  Dkt. No. 3 at 14.  In turn, they contend that Petitioner's circumstances are governed by 8 U.S.C. § 1225(b)(2)(A) which mandates the detention.  *See id.* at 14-18.  Respondents also contend that even if Petitioner's detention is not mandatory, it does not violate any constitutional due process guarantees because his status is that of a person "stopped at the border" and he had been detained for mere hours before he filed the petition.  *Id.* at 18.

In his reply, Petitioner cites recent cases from other judges in the Northern District as well as other courts in the Second Circuit to support his argument "that post-parole re-detention falls under 1226(a)."  Dkt. No. 4 at 2.  Petitioner contends immediate release is the appropriate remedy for "the unlawful detention under § 1225(b) and the failure to provide an individualized bond hearing . . . ."  *Id.* at 4.

A.    **Statutory Authority**

The Second Circuit discussed the humanitarian parole provision of the INA in *Ibragimov v. Gonzales*, 476 F.3d 125 (2d Cir. 2007).  The Second Circuit explained that "Section 212(d)(5)(A) of the INA provides the Attorney General with discretion to parole into the United States certain aliens who apply for admission."  *Id.* at 134 (citing 8 U.S.C. § 1182(d)(5)(A)).  "The terms of th[e] statute reflect the well-settled principle that Congress did not intend for parole of an alien to constitute an alien's legal entry or admission to the United States."  *Id.* (citing *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958); *United States ex rel. Kordic v. Esperdy*, 386 F.2d 232, 235 (2d Cir. 1967)).  "Instead, parole is a means by which the government allows aliens who have arrived at a port-of-entry to temporarily remain in the United States pending the review and

6

adjudication of their immigration status." *Id.* The Second Circuit stated that "[a]lthough paroled aliens physically enter the United States for a temporary period, they nevertheless remain constructively detained at the border, *i.e.* legally unadmitted, while their status is being resolved by immigration officials." *Id.*

In its response to the petition, the Government acknowledges that the *Ibragimov* court deferred to immigration agency interpretations of the INA under *Chevron* deference. *See* Dkt. No. 3 at 15; *see also Ibragimov*, 476 F.3d at 135 (citing *Matter of Oseiwusu*, 22 I & N Dec. 19, 19-20 (BIA 1998) (holding that aliens returning pursuant to a grant of advance parole are "arriving aliens")). However, as the Government notes, the Supreme Court overruled *Chevron* in 2024. *Id.* at 16 (citing *Loper Bright Ent. v. Raimondo*, 603 U.S. 368, 394 (2024)). And, "even in *Ibragimov*, where the Second Circuit deferred to the agency interpretation of 'arriving alien' . . ., it nonetheless described humanitarian parole under Section 1182(d)(5)(A) as 'a means by which the government allows aliens who have arrived at a port-of-entry to temporarily remain' in the country even as the parolee has not been 'admitted' to the United States." *Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274, 307–08 (E.D.N.Y. 2025) (citing *Ibragimov*, 476 F.3d at 134) (emphasis omitted). As a result, and as Respondents state, "many district courts have rejected the agency's definition of 'arriving alien' . . . as including aliens whose Section 1182(d)(5)(A) parole has expired." Dkt. No. 3 at 16 (citing *Rodriguez-Acurio*, 811 F. Supp. 3d at 302; *Covelli-Chaparro v. Bondi*, 2026 WL 118842, *6 (E.D.N.Y. Jan. 15, 2026); *Qasemi v. Francis*, No. 25-CV-10029, 2025 WL 3654098, at * 6 (S.D.N.Y. Dec. 17, 2025); *Ruiz v. Trump*, No. 2:26-CV-00012, 2026 WL 323254, *5 (D. Vt. Feb. 6, 2026)).

On March 11, 2026, the Honorable Anne M. Nardacci addressed this issue in a nearly indistinguishable case. In *Olivares v. ICE Custodian*, No. 9:26-CV-203, 2026 WL 686090

7

(N.D.N.Y. Mar. 11, 2026), Judge Nardacci found "meritless the Government's position that Petitioner—who, more than two years ago, made an appointment with immigration authorities, presented himself at a port of entry, was paroled into the country, and whose asylum application remains pending—is subject to mandatory detention as if he had been arrested attempting to unlawfully cross the border." *Id.* at \*7.  Judge Nardacci held that Olivares was being detained pursuant to § 1226(a) and that his detention was unconstitutional and ordered his immediate release.  *See id.* at \*8.[1]

The Honorable Elizabeth C. Coombe also recently ordered that a petitioner be immediately released from detention after he had been paroled into the United States, his parole was terminated, and he was subsequently detained without justification beyond the incorrectly asserted legal authority granted to ICE under § 1225.  *See Arce v. Bondi*, 9:26-CV-501, Dkt. Nos. 6, 11

The majority of federal district courts addressing the issue have concluded the same—that the mandate in 8 U.S.C. § 1182(d)(5)(A), which requires a noncitizen to "be returned to the custody from which he was paroled" "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served," requires the petitioner to "be treated just as the INA would treat any noncitizen previously granted parole and living in the United States." *Pereira v. Dedos*, No. 1:26-CV-1141, 2026 WL 1134030, \*2 (D.N.M. Apr. 27, 2026); *see, e.g.*, *Imamov v. Warden*, No. 26-CV-2204, 2026 WL 1164682, \*6 (E.D. Pa. Apr. 29, 2026); *Rivera v. Blanche*, No. 2:26-CV-03892, 2026 WL 1153665, \*4 (D.N.J. Apr. 29, 2026); *Zamora v. Mullin*,

---

[1] The only meaningful difference between Petitioner and Olivares is that Petitioner has never been arrested for a crime whereas, before being detained by ICE, Olivares was arrested by local law enforcement officers and charged with driving while intoxicated.  *See Olivares*, 2026 WL 686090, at \*3.  As discussed later in this decision, Petitioner's lack of criminal history makes the due process violation that much worse.

No. 26-CV-00538, 2026 WL 1026810, *3-4 (D. Colo. Apr. 16, 2026); *Gomez-Talero*, No. 26-CV-1625, 2026 WL 926145, *2 (E.D.N.Y. Apr. 6, 2026); *Cabrera-Lopez v. Hyde*, No. 2:26-CV-00017, 2026 WL 540131, *9 (D. Vt. Feb. 26, 2026); *Mohd v. Noem*, No. 2:26-CV-680, 2026 WL 363525 , *3 (E.D.N.Y. Feb. 9, 2026).

As one court has stated, "[r]eturning to 'custody' simply means returning to 'the care and control of [another] for inspection, preservation or security.'" *Ontiveros v. Warden*, No. 3:26-CV-632, 2026 WL 1109422, *5 (N.D. Ohio Apr. 24, 2026) (quoting *Qasemi*, 2025 WL 3654098, in turn quoting Black's Law Dictionary 390 (7th ed. 1999)). "Thus, § 1182(d)(5)(A)'s mandate that a[ noncitizen] return to 'the custody from which he was paroled' simply means that the [noncitizen] must return to the 'care and control' of the Department of Homeland Security." *Id.* "It says nothing about the 'status' the [noncitizen] will hold or the detention authority under which the government will operate once the parolee returns to such care and control." *Id.*

Moreover, "the parolee's 'physical presence within the United States cannot be said to be unlawful or illegal' since the parole is authorized by the Attorney General." *De Law Cruz v. Rhoney*, No. 25-CV-6699, 2026 WL 891658, *6 (W.D.N.Y. Apr. 1, 2026) (quoting *United States v. Balde*, 943 F.3d 73, 84 (2d Cir. 2019)). "Indeed, 'parole has long been understood to constitute lawful status.'" *Id.* (citation omitted). "The Supreme Court has confirmed that 'nothing in th[e] text [of Section 1182(d)(5)(A)] . . . affirmatively authorizes detention,' so the statute is not an independent authority to detain parolees following the expiration of parole." *Id.* (quoting *Clark v. Martinez*, 543 U.S. 371, 385 (2005)). To the contrary, it provides that, when parole is revoked, "the alien shall . . . be returned to the custody from which he was paroled and thereafter *his case shall continue to be dealt with in the same manner as that of any other applicant for admission*." *Clark*, 543 U.S. at 385 (citation omitted). Therefore, "a person who has stayed years beyond the

9

expiration of his or her term of parole is no different than any other noncitizen who entered without inspection and was detained while unlawfully present in the country and not seeking admission." *De Law Cruz,* 2026 WL 891658, at *6.

INA's regulatory framework supports this conclusion. "Regardless of the type of termination, once a noncitizen's parole has been terminated, implementing regulations require that 'any order of exclusion, deportation, or removal previously entered shall be executed.'" *Coreas v. Mullin*, No. 2:26-CV-591, 2026 WL 1121974, *5 (D. Nev. Apr. 24, 2026) (quoting 8 C.F.R. § 212.5(e)(2)(i)). "'If the exclusion, deportation, or removal order cannot be executed within a reasonable time, the [noncitizen] *shall* again be released on parole unless in the opinion of [a DHS official with authority] the public interest requires that the [noncitizen] be continued in custody.'" *Id.* (quoting 8 C.F.R. § 212.5(e)(2)(i)). "Stated differently, unless detention is required for the timely removal of a noncitizen, continued detention following release on parole must be supported by individualized assessment by an authorized DHS official." *Id.* "Otherwise, implementing regulations require that a noncitizen be returned to humanitarian parole." *Id.* Here, Petitioner has not been ordered to be removed. Therefore, "his case shall continue to be dealt with in the same manner as that of any other applicant for admission." *Clark*, 543 U.S. at 385 (citation and emphasis omitted). It is likewise possible that he should be placed back on humanitarian parole. *See id.*

One day after the Government filed its response in this case, the Second Circuit decided *Cunha v. Freden*, No. 25-3141, 2026 WL 1146044 (2d Cir. Apr. 28, 2026). *Cunha* concerned a petitioner who had unlawfully entered the country over twenty years before, applied for asylum and was granted work authorization, and had never been arrested. *See id.* at *2. The Second Circuit discussed the relevant statutory scheme governing detention of noncitizens and noted, in

part, that "noncitizens who have been in the United States for more than two years get full removal proceedings, may be detained, and may be granted release on bond or conditional parole, . . . unless they have committed certain crimes[.]" *Id.* at *14 (citing *Jennings v. Rodriguez*, 583 U.S. 281 (2018), citing in turn 8 U.S.C. § 1226(a)).  The Second Circuit affirmed that "'once an alien enters the country, the legal circumstance changes, . . . whether their presence here is lawful, unlawful, temporary, or permanent.'"  *Id.* (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).  The *Cunha* court was tasked with answering whether a noncitizen is to be considered an "applicant for admission" and one who is "seeking admission" such that the individual would fall under § 1225(b)(2)(A)'s mandatory detention provision.  *Id.* at *5.  The Second Circuit held in the negative, determining that the "[p]etitioner may be an 'applicant for admission,' but he is not 'seeking admission'" such that his detention fell under the discretionary provision of § 1226(a).  *Id.*

This case is not the exact same because Cunha was not granted humanitarian parole into the United States.  However, the Government argues here, like it did in *Cunha*, that Petitioner is categorized as "an arriving alien seeking admission"; therefore, his detention falls under § 1225.  Dkt. No. 3 at 14.  The Court agrees with the collection of district courts from across the country, and applies the Second Circuits guidance in *Cunha*, that, under the present circumstances, Petitioner is not an "arriving alien"; therefore, he does not fall under the mandatory detention provision of § 1225.

Section 1182(d)(5)(A) mandates that a noncitizen whose parole has ended "shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States."  8 U.S.C.A. § 1182(d)(5)(A).  *Cunha* instructs that "Section 1225(b)(2)(A) does not apply to [] noncitizens, who are present in the United States after entering the country without

11

inspection and admission, and who were not apprehended while entering the country or shortly thereafter." *Cunha*, 2026 WL 1146044, at *2. In other words, although a noncitizen may be "an 'applicant for admission' within the meaning of Section 1182(d)(5)(A), [that does not automatically mean the] noncitizen [is] 'arriving in the United States' within the meaning of Section 1225(b)(1)(A)(i)." *Qasemi*, 2025 WL 3654098, at *6. That is true where the noncitizen "has already arrived, was paroled, entered, and has now been present in the United States for over a year. None of that is changed by the fact that he has not been formally admitted." *Id.*; *see also Rodriguez-Acurio*, 811 F. Supp. 3d at 307 ("[I]t would be illogical to find that [a petitioner] is still in the process of 'arriving' in the United States when she has been continuously residing in the United States for more than three years after the expiration of her humanitarian parole"); *Carlos v. Crawford*, No. 2:26-CV-12, 2026 WL 1165576, *5 (E.D. Va. Apr. 29, 2026) ("Accordingly, like a noncitizen who unlawfully enters the United States and is present for years prior to being detected, . . . after Petitioner's short-term parole ended, Petitioner established a []year [long] presence prior to being 'rediscovered'") (citation omitted).

Petitioner, who was released into the United States on his own recognizance under humanitarian parole in 2023 and continued to reside in the United States for one year after his parole had been terminated, cannot be said to be "seeking admission." Therefore, he is not subject to mandatory detention pursuant to § 1225(b)(2)(A) and his detention falls under the discretionary provision of § 1226(a).[2]

---

[2] The Court must acknowledge that district courts decisions addressing this issue are not unanimous. There are a few cases that have held that a parolee who is re-detained falls under § 1225, which mandates detention. For example, one court stated that the "[p]etitioner cites to several district court cases that suggest that any applicant for admission who has been 'living in the United States outside parole and is later apprehended is detained under section 1226.' . . . But such an interpretation would violate congressional intent. . . . Granting petitioner 'a number of substantial rights' such as a bond hearing available under § 1226 but not § 1225, solely because

**B.      Due Process**

The Government argues Petitioner's detention does not violate due process protections because "§ 1225(b) does not violate the Constitution" and "Petitioner had been detained for mere hours when he filed this Petition, and for one week as of this filing, [so] his due process claim is premature." Dkt. No. 3 at 19.

Respondents are correct that the Supreme Court has "recognize[d]" that six months of detention is presumptively constitutional. *See Zadvydas*, 533 U.S. at 701; *see also* Dkt. No. 3 at 18. However, in *Zadvydas*, the Supreme Court was addressing detention "when an alien has been found to be unlawfully present in the United States and a final order of removal has been entered" and "the Government ordinarily secures the alien's removal during a subsequent 90-day statutory 'removal period,' during which time the alien normally is held in custody." *Zadvydas*, 533 U.S. at 682. The Supreme Court was tasked with "decid[ing] whether this post-removal-period statute authorizes the Attorney General to detain a removable alien indefinitely beyond the removal period or only for a period reasonably necessary to secure the alien's removal." *Id.* The Supreme Court stated it was "deal[ing] with aliens who were admitted to the United States but subsequently ordered removed." *Id.* That is not what the Court is dealing with, here.

The Government contends Petitioner is being detained "pending his removal from the United States." Dkt. No. 3 at 9. The Government cites to a declaration provided with its response

---

ICE detained petitioner *within* the border, would give aliens exactly the 'perverse incentive to enter at an unlawful rather than a lawful location' that Congress sought to prevent." *Ajay Ajay v. Maldonado*, No. 26-CV-0676, 2026 WL 1045420, *3 (E.D.N.Y. Apr. 17, 2026) (citations omitted); *see also Palma v. Arteta*, No. 25-CV-9340, 2026 WL 697015, *4 (S.D.N.Y. Mar. 12, 2026) ("[A]n alien . . . 'who has never been lawfully admitted into this country—but has been living here nonetheless—[is] subject to [detention without a bond hearing] under 8 U.S.C. § 1225(b)(2)(A)'"). Those cases, however, were decided before the Second Circuit weighed in on the issue in *Cunha*. Therefore, they do not alter this Court's conclusion.

13

from an ICE Officer which states that Petitioner remains detained "pending his removal from the United States. Petitioner is currently in removal proceedings before the immigration court." Dkt. No. 3-1 at ¶ 10. In a Notice to Appear dated September 13, 2023, Petition was ordered to appear before an immigration judge on June 2, 2027, "to show why [he] should not be removed from the United States . . . ." Dkt. No. 3-2 at 3.

Petitioner has been "in removal proceedings" since the day he arrived in the United States. He has not, however, been ordered to be removed. Respondents have not presented the Court with any decision from an immigration judge or administrative body ordering Petitioner's removal. Therefore, his detention is not "pending his removal from the United States," Dkt. No. 3 at 9, and *Zadvydas*, which dealt with noncitizens who were ordered removed, does not require the Court to apply the constitutional presumption of reasonableness to Petitioner's detention.

Respondents cite six district court cases to support their argument that the petition is premature and the Court should dismiss the due process claim. *See* Dkt. No. 3 at 18-19. None of the Government's citations are instructive because each petitioner in the cited cases was ordered to be removed. *See Lucce v. Freden*, No. 25-CV-6342-MAV, 2025 WL 3214485, *1 (W.D.N.Y. Nov. 18, 2025) (noting that an immigration judge "ordered him removed to Haiti") *De Oliveira Jimenez v. Searls*, No. 22-CV-960, 2023 WL 11134381, *1 (W.D.N.Y. Mar. 2, 2023) ("[T]he Immigration Judge . . . found De Oliveira Jimenez removable"); *Mitchell v. Wolf*, No. 20-CV-1183, 2021 WL 1516450, *1 (W.D.N.Y. Apr. 15, 2021) ("That day, the IJ found Mitchell removable"); *Contreras Blanco v. Garland*, No. 21-CV-172, 2021 WL 3667201, *2 (W.D.N.Y. Aug. 18, 2021) ("Contreras Blanco's removal became final when the Second Circuit denied his motion for a stay on July 27, 2021"); *Bazile v. Garland*, No. 20-CV-1819, 2021 WL 9455715, *1 (W.D.N.Y. July 1, 2021) (stating that the immigration judge "ordered him removed to Haiti");

14

*Frederick v. Feeley*, No. 19-CV-6090, 2019 WL 1959485, *1 (W.D.N.Y. May 2, 2019) ("An immigration judge denied [the p]etitioner's motion for cancellation of removal and ordered him removed").

Accordingly, the Court finds no reason it should not engage in a due process analysis. Rather, "even if detention never becomes prolonged, the government's interpretation would require a legitimate rationale, which the government has not attempted to articulate with respect to noncitizens like Petitioner." *Cunha*, 2026 WL 1146044, at *22. "Whatever the duration of detention, it must still 'serve its purported immigration purpose,' . . . which must 'outweigh[ ] the individual's constitutionally protected interest in avoiding physical restraint[.]'" *Id.* (quoting *Demore v. Kim*, 538 U.S. 510, 527 (2003); *Zadvydas*, 533 U.S. at 690).

To evaluate whether an individual's due process rights have been violated, courts analyze (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Black v. Decker*, 103 F.4th 133, 151 (2d Cir. 2024) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)) (quotation marks omitted).

Here, "'[t]he private interest affected by the official action is the most significant liberty interest there is—the interest in being free from imprisonment.'" *Id.* (quoting *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020)). "Second, given the absence of process in connection with Petitioner's detention, the risk of an erroneous deprivation of that Petitioner's liberty interest is high." *Olivares*, 2026 WL 686090, at *8; *see also Mendez v. Field Off. Dir.*, No. 9:26-CV-337, 2026 WL 734347, at *4 (N.D.N.Y. Mar. 16, 2026) ("[T]here is nothing in the record indicating

15

that (1) there were changed circumstances between when she was released on her own recognizance into the United States and when she was arrested that support the change in her detention status, (2) Petitioner is currently a risk of flight or a danger to the community, or (3) anyone considered whether, given her specific situation, Mendez was a risk of flight or a danger to the community. . . .  [T]here is a high risk of erroneous deprivation of Petitioner's liberty").

Third, the Government argues that the petition is premature because of the length of Petitioner's detention but does not propose a single interest that it holds in keeping Petitioner detained. *See* Dkt. No. 3 at 18-19.  The Second Circuit has noted that although "[t]he Government . . . has an interest in the prompt execution of removal orders. . . . The Government's interest in the prompt execution of removal orders against individuals who have not yet been deemed removable is not apparent . . . ."  *Velasco Lopez*, 978 F.3d at 854 n.10.

According to the information presently before the Court, Petitioner has continuously conducted himself in a lawful manner since entering the United States in September of 2023.  He has no criminal history from before or after his arrival in the United States.  He made an appointment with immigration officials to seek entry into this country.  He attended his appointment and was placed on humanitarian parole.  He obtained employment.  He applied for asylum.  His parole was terminated in April of 2025, yet Respondents did not detain him until April of 2026.  The Government does not provide a single reason for detaining Petition other than the fact that his parole had expired one year earlier.  Petitioner has not been ordered removed from the country.  His asylum application and removal proceedings remain pending.

In sum, because Respondents detained Petitioner pursuant to the wrong statute, and they have not provided any other justification for his detention, Petitioner's due process rights were violated. *See Colindres v. Tellez*, No. 26-CV-0663, 2026 WL 509493, *3 (E.D.N.Y. Feb. 23,

16

2026) ("Respondents effectively admit that they did not exercise discretion to re-detain Petitioner; rather, they detained Petitioner under the belief that his detention was mandatory pursuant to Section 1225(b)(2)(A)").

As to the appropriate remedy, "habeas is at its core a remedy for unlawful executive detention. The typical remedy for such detention is, of course, release." *Munaf v. Green*, 553 U.S. 674, 693 (2008).  As the Government has not presented a single reason why Petitioner should be detained—they have not argued nor presented any evidence that he is a danger to the community or a flight risk—and Petitioner has remained free in this country, working, law abiding, and waiting for his June 2027 immigration court hearing, immediate release is the appropriate remedy. *Compare Gunduzalp v. Joyce*, No. 26-CV-2330, 2026 WL 948736, *3 (S.D.N.Y. Apr. 8, 2026) (ordering a bond hearing to be held within three days or the petitioner must be released because "[t]here is evidence in the record that suggests the Government may have exercised some discretion in detaining [the p]etitioner.  According to the Government, ICE[] received a tip regarding [the p]etitioner . . ., which 'displayed verifiable, personal knowledge of Petitioner and his circumstances' and 'contained information that Petitioner posed a threat to national security'"), *with Arango Carmona v. Maldonado*, No. 26-CV-2005, 2026 WL 972780, *3 (E.D.N.Y. Apr. 10, 2026) (ordering the petitioner to be immediately released because the "[r]espondents detained [the p]etitioner pursuant to the wrong statute, without any individualized custody determination, prior notice, or opportunity to be heard").

## IV. CONCLUSION

**ORDERED** that the Petition for a writ of habeas corpus, Dkt. No. 1, is **GRANTED**; and it is further

**ORDERED** that Petitioner shall be immediately released from custody; and it is further

**ORDERED** that Respondents shall certify compliance with the Court's order regarding Petitioner's release no later than Friday, May 8, 2026, at 5:00 P.M.; and it is further

**ORDERED** that having considered the particular circumstances of this case and *Mathews v. Eldridge*, 424 U.S. 319 (1976), Petitioner Erickson Jhonaikerht Hernandez Villasmil shall not be re-detained without adequate notice to Petitioner and without an opportunity to be heard at a hearing where the Government will have the burden of showing that his detention is authorized under 8 U.S.C. § 1226(a) and the burden to demonstrate by clear and convincing evidence that Petitioner is either a danger to the community or a flight risk; and it is further

**ORDERED** that pending the issuance of any final removal order against Petitioner Erickson Jhonaikerht Hernandez Villasmil, Respondents are also enjoined from denying him bond in any subsequent proceeding on the basis that he must be detained pursuant to 8 U.S.C. § 1225(b), absent a change in relevant circumstances, consistent with this Memorandum-Decision and Order; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment in Petitioner's favor and close this case; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  May 5, 2026
      Albany, New York

Mae A. D'Agostino
U.S. District Judge

18